IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL ACTION** |
| | : | |
| v. | : | |
| | : | |
| **KAHMERE CASEY** | : | **No. 23-392** |

### MEMORANDUM

PRATTER, J.                                                                         DECEMBER //, 2023

Kahmere Casey was charged with possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1). Mr. Casey filed a motion to dismiss that charge in light of the decision of the Third Circuit Court of Appeals in *Range v. Attorney General* that 18 U.S.C. § 922(g)(1) was unconstitutional as applied to Mr. Range. 69 F.4th 96 (3d Cir. 2023) (en banc). Although "the Government did not carry its burden of showing that our Nation's history and tradition of firearm regulation support[ed] disarming Range," *id.* at 98, here the Government brings forward a historical record replete with firearm regulations applying to those who pose a danger to others. Thus, because the Government carries its burden under *Range* and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111 (2022), the Court denies Mr. Casey's motion.

### BACKGROUND

On June 19, 2018, Mr. Casey was convicted in the Philadelphia Court of Common Pleas of Robbery, in violation of 18 Pa. Con. Stat. § 3701(a)(1)(ii), and Conspiracy to Commit Robbery, in violation of 18 Pa. Con. Stat. § 903. Those convictions arose from Mr. Casey's involvement in a gunpoint robbery, in which he and a co-conspirator lured the victim to their block, and Mr. Casey robbed the victim while his co-conspirator threatened the victim with a gun.

1

On July 20, 2023, Mr. Casey was arrested in Philadelphia after allegedly discarding a loaded Springfield XDM Elite firearm as he fled from police officers. On September 6, Mr. Casey was charged in a one-count federal indictment with possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1).

## DISCUSSION

Mr. Casey primarily argues that Section 922(g)(1) is unconstitutional as applied to him because the Government cannot identify a longstanding historical tradition of disarming people like Mr. Casey.

In *Range*, Mr. Range filed a civil suit in which he averred that Section 922(g)(1) violated the Second Amendment *as applied to him*. 69 F.4th at 99 (emphasis added). Mr. Range tried to purchase a firearm in 1998, but the Pennsylvania instant background check system rejected that purchase after it was discovered that Mr. Range was previously convicted of a Pennsylvania misdemeanor punishable by up to five years' imprisonment. *Id.* at 98–99. Mr. Range's crime dated back to 1995 when he pled guilty to making a false statement to obtain food stamps because he and his wife struggled to raise their three children, earning only $300 a week. *Id.* at 98. At the time of filing his complaint, Mr. Range's single conviction from over 25 years earlier still precluded him from purchasing a firearm. *See id.*

The Third Circuit Court of Appeals first held that Mr. Range was among "the people" protected by the Second Amendment, even though he had a false statement misdemeanor conviction from 1995. *Id.* at 103. In its reasoning, the Third Circuit Court of Appeals rejected the Government's contention that the Second Amendment applied only to "law-abiding, responsible citizens[,]" in part because that description "is as expansive as it is vague." *Id.* at 102. Instead, "the people" "unambiguously refers to all members of the political community, not an unspecified subset." *Id.* at 101 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008)).

The Third Circuit Court of Appeals recognized, however, that it was "hardly illogical" "[t]hat individuals with Second Amendment rights may nonetheless be denied possession of a firearm." *Id.* at 102 (quoting *Binderup v. Att'y Gen.*, 836 F.3d 336, 344 (3d Cir. 2016)). The court also agreed with then-Judge Barrett's reasoning that "'all people have the right to keep and bear arms,' though the legislature may constitutionally 'strip certain groups of that right.'" *Id.* (quoting *Kanter v. Barr*, 919 F.3d 437, 452 (7th Cir. 2019) (Barrett, J., dissenting).

The Third Circuit Court of Appeals also held that the Government did not fulfill its obligations under *Bruen*. *Id.* at 103 (quoting *Bruen*, 142 S. Ct. at 2130). After analyzing the Government's arguments in *Range,* the Third Circuit Court of Appeals ultimately held that the Government did not carry its burden of "show[ing] that the Nation's historical tradition of firearms regulation support[ed] depriving Range of his Second Amendment right to possess a firearm." *Id.* at 106.

Here, the Government concedes that Mr. Casey "is one of 'the people' protected by the Second Amendment." Opp. to Mot. to Dismiss (Doc. No. 10) at 7. The next question is whether Section 922(g)(1) regulates Second Amendment conduct. *Range,* 69 F.4th at 103. In two simple words: "It does." *Id.* The relevant inquiry, therefore, is whether the Government has carried its burden demonstrating that Mr. Casey should be deprived of his Second Amendment right consistent with the Nation's historical tradition of firearms regulation. And the Government has met that burden here.

First, the Government has presented multiple illustrations of colonial and early state legislatures disarming individuals who, like Mr. Casey, "posed a potential danger" to others. *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives,* 700 F.3d 185, 200 (5th Cir. 2012), *abrogated on unrelated grounds by Bruen,* 142 S. Ct. 2111. For example, dating

3

back to England in the 17th century, statutes existed in which the government could "seize all arms in the custody or possession of any person" deemed "dangerous to the Peace of the Kingdom." Militia Act 1662, 13 & 14 Car. 2, c. 3, § 13. At the founding of our own Nation, state legislatures disarmed those who posed a danger to society when they engaged in particular conduct. *See, e.g.*, Act for the Punishing of Criminal Offenders, 1692 Mass. Laws 11–12; Act for the Punishing Criminal Offenders, 1696–1701 N.H. Laws 15. And the Government brings forward numerous other examples, such as laws allowing officials to disarm individuals deemed dangerous to society. *See, e.g.*, Act for Constituting a Council of Safety, ch. 40, § 20, 1777 N.J. Laws 90 (permitting officials to "take from such Persons as they shall judge disaffected and dangerous to the present Government, all the Arms, Accoutrements and Ammunition which they own or possess").

In her dissent in *Range*, Judge Krause provided a thorough examination of similar legislation and statutes that existed from the time of the English Restoration to the ratification of the U.S. Constitution. For example, she discussed the colonies placing restrictions on those who "could not be trusted to obey the law[,]" and even on those considered part of the limited body politic at the time. *Range*, 69 F.4th at 122 (Krause, J., dissenting). Revolutionary Virginia disarmed those who would not "abide by the newly sovereign state's legal norms[,]" and the government disarmed those who could not be trusted to abide by the law even here in Pennsylvania. *Id.* at 125 (Krause, J., dissenting). These serve as examples, "consistent with this Nation's historical tradition of firearm regulation[,]" of the disarmament of those with prior convictions who posed a potential danger to society. *See Bruen*, 142 S. Ct. at 2126.

Mr. Range himself had argued that "dangerousness" is the "touchstone" to disarming felons. *See Range*, 69 F. 4th at 104 n.9. Though the majority did "not decide this dispute[,]" *id.*, it did hold that "[f]ounding-era laws often prescribed the *forfeiture of the weapon used to commit a*

4

*firearms-related offense* without affecting the perpetrator's right to keep and bear arms generally." *Id.* at 105 (emphasis added). And other judges and justices within the *Range* and *Bruen* majorities have found similarly. *See, e.g., Folajtar v. Att'y Gen.*, 980 F.3d 897, 913 (3d Cir. 2020) (Bibas, J., dissenting) ("In England and colonial America, the Government disarmed people who posed a danger to others."); *Kanter*, 919 F.3d at 454 (Barrett, J., dissenting) ("The historical evidence does, however, support a different proposition: that the legislature may disarm those who have demonstrated a proclivity for violence or whose possession of guns would otherwise threaten public safety.").

Here, Mr. Casey's prior criminal convictions place him within the category of those who have been disarmed consistent with the Nation's historical tradition. Mr. Casey was previously convicted of Robbery and Conspiracy to Commit Robbery. These convictions were based on Mr. Casey's involvement in a gunpoint robbery, in which Mr. Casey and his co-conspirator lured the victim to their block, and Mr. Casey robbed the victim while his co-conspirator threatened the victim with a gun. In the instant offense, Mr. Casey allegedly fled from the police and discarded a fully loaded handgun, which also had a round in the chamber. Moreover, Mr. Casey allegedly stole this handgun.

Unlike Mr. Range, who previously understated his income to qualify for government benefits to feed his family and sought to buy a hunting rifle and potentially a shotgun, Mr. Casey was previously convicted of robbery and conspiracy to commit robbery and was allegedly found in possession of a fully loaded, stolen handgun. The Court particularly notes the allegation that the handgun giving rise to the present charge was allegedly stolen, because "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. Mr. Casey is thus of those "who pose[] a danger to others" and

has "demonstrated a proclivity for violence or whose possession of guns would otherwise threaten public safety." *See Kanter*, 919 F.3d at 454 (Barrett, J., dissenting); *Folajtar*, 980 F.3d at 913 (Bibas, J., dissenting); *see also United States v. Gore*, No. 2:23-cr-04, 2023 WL 2141032, at *4 (S.D. Ohio Feb. 21, 2023) ("this Court can think of no lawful purpose for which a private citizen would knowingly possess a stolen firearm."). Therefore, Section 922(g)(1) is constitutional as applied to Mr. Casey.

Furthermore, Mr. Casey argues that Section 922(g)(1) is facially unconstitutional. In *Heller*, however, the Supreme Court held that "the longstanding prohibitions on the possession of firearms by felons" is "presumptively lawful." *Heller*, 554 U.S. at 626-27 & n.26. In other words, the *Heller* Court "recognized that history supported the constitutionality of some laws limiting the right to possess a firearm, such as laws . . . prohibiting possession by felons and other dangerous individuals." *NYSRPA v. City of New York*, 140 S. Ct. 1525, 1540-41 (2020) (Alito, J., dissenting). And "the Court in *Heller* affirmatively *approved* a slew of gun laws[,]" including "felon-in-possession laws, and the like[.]" *Heller v. District of Columbia*, 670 F.3d 1244, 1278 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).

Finally, as a colleague in this district recently observed, "nearly every opinion in [the Third Circuit] addressing this issue after *Range* has held that § 922(g)(1) is constitutional both on its face and as applied." *United States v. Hedgepeth*, 22-cr-377, 2023 WL 7167138, at *8 & n.5 (E.D. Pa. Oct. 31, 2023). In sum, the Government has met its burden of demonstrating that the historical traditions of this Nation render Section 922(g)(1) constitutional on its face and as applied to Mr. Casey.

## CONCLUSION

For the foregoing reasons, Mr. Casey's motion to dismiss is denied.

BY THE COURT:

_____
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE